UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| James N. Parillo, et al.,<br>    *Plaintiffs*,<br><br>    *v.*<br><br>FKI Industries, Inc.,[1]<br>    *Defendant*. | Civil No. 3:07cv414 (JBA)<br><br><br><br>March 19, 2009 |

**RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiffs include a class of retired former employees of Bristol Babcock, Inc. ("BBI") who allege that they have been denied vested health benefits and who seek relief pursuant to § 502(a)(1)(B) and (a)(3) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B) and (a)(3), and § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a). Defendant FKI Industries, Inc. ("FKI"), which formerly owned BBI and retained responsibility for the post-retirement welfare-benefits plan at issue (the "Plan"), has moved for summary judgment on the ground that Plaintiffs cannot prove the existence of an agreement to vest the benefits provided under the Plan.

**I.   Background**

The facts are essentially undisputed. The terms of the Plan are set forth in various collective-bargaining agreements ("CBAs") entered into between BBI and Plaintiffs' union covering the period 1992 to 2007. Prior to 1993, BBI offered its retirees a different benefit program, the terms of which included an express reservation of the right to modify or terminate the benefits arrangement. As of 1995, BBI had completely eliminated this retiree

---

[1] Although both parties' briefing included FKI, Plc in the case caption, that entity was dismissed from the case by stipulation in July 2007.

benefits program and replaced it with the Plan at issue in this case, which provided a monthly stipend to be used to pay for medical coverage in retirement. In each subsequent CBA, the terms of the Plan were set out using the following language:

> Retiree Medical: Effective 1/1/93 provide benefit up to $5.00 for retiree and $5.00 for dependent spouse times years of service, per month. Employees may purchase coverage elsewhere or purchase the Company Plan. The monthly benefit can be applied towards either of these coverages with the retiree contributing the difference in cost. Employees will not be reimbursed for an amount larger than the benefit, nor will they receive any remainder if coverage costs less than the benefit.

(Ex. C.)

In 2006, after selling its stock in BBI, FKI modified the terms of the Plan to condition the stipend on enrollment in FKI-sponsored medical coverage. FKI gave each participating retiree a one-time opportunity to enroll in either of two FKI-sponsored medical plans by May 31, 2006, and the company advised the retirees that the medical stipends would terminate if they declined to enroll in these new programs. Plaintiffs' claims arise from this modification of the Plan that conditions the health benefits on enrollment on the company-sponsored medical coverage.

The parties also do not dispute several statutory preliminaries. They agree that the Plan is a welfare-benefits plan within the meaning of ERISA, that FKI is the Plan's administrator and sponsor, and that the Plan terms are found in the CBAs.

## II.    Vested Retiree Benefits

As framed by the parties, the central issue to be decided is under what circumstances a promise of retiree health benefits becomes vested such that the later termination of those benefits can be challenged in a denial-of-benefits claim. The Second Circuit has addressed this issue on several occasions. *See Bouboulis v. Transport Workers Union of Am.*, 442 F.3d

2

...

55, 60–63 (2d Cir. 2006); *Devlin v. Empire Blue Cross & Blue Shield*, 274 F.3d 76, 82–85 (2d Cir. 2001); *Joyce v. Curtiss-Wright Corp.*, 171 F.3d 130, 134–35 (2d Cir. 1999); *American Fed'n of Grain Millers v. Int'l Multifoods Corp.*, 116 F.3d 976, 979–83 (2d Cir. 1997); *Schonholz v. Long Island Jewish Med. Ctr.*, 87 F.3d 72, 77–78 (2d Cir. 1996). A review of the principles found in these cases will be helpful here.

### A.    Legal Framework

*Schonholz* established that a plaintiff claiming her vested welfare benefits were unlawfully terminated does not have to "point to unambiguous language to support her claim," and can survive summary judgment "if she can point to written language capable of reasonably being interpreted as creating a promise on the part of the [employer] to vest her severance benefits." 87 F.3d at 78. But the "general rule" for welfare benefits is that they do not automatically vest, which means "an employer has the right to terminate or unilaterally to amend the plan at any time." *Id.* at 77. In that case, the district court had granted summary judgment to the employer because the terms claimed to establish vesting were memorialized in informal letters, not formal documents. *Id.* Declining to require this level of formality, the Second Circuit reversed and remanded based on its view that an agreement to vest benefits need only be memorialized with the "same level of formality" that the employer used in establishing the underlying benefits plan. *Id.* at 78. The court further clarified that an agreement to vest benefits need not be expressed with "precise language denying the right to withdraw benefits." *Id.*

The Second Circuit reaffirmed this approach the following year in *Multifoods*. There, the employer provided its retirees with free medical insurance pursuant to various CBAs. *Multifoods*, 116 F.3d at 978. When the CBAs expired, the employer continued to provide

these retiree benefits for a time, but later amended its ERISA plan to provide that the retirees would be responsible for any increases in costs which outpace the rate of inflation, leading the retirees to sue pursuant to ERISA and the LMRA. *Id.* On appeal from the district court's grant of summary judgment to the employer, the Second Circuit first reiterated that retiree welfare benefits are non-vesting by default: ERISA permits an employer to alter or eliminate such benefits at any time, and the LMRA provides the same freedom after a CBA expires. *Id.* at 979. Applying the *Schonholz* standard, the court then turned to the CBA language:

> Each CBA states that retiree medical benefits could not be reduced "during the term of this Agreement." Promising to provide benefits for a certain period of time necessarily establishes that once that time period expires, the promise does as well. Therefore, we conclude that this provision unambiguously establishes that once the CBAs expired, [the employer] was free to reduce retiree medical benefits.

*Id.* at 981 (citation omitted). The *Multifoods* panel rejected the argument that freely providing benefits after the expiration of the CBAs creates any ambiguity, and further held that the effect of extrinsic evidence was immaterial in light of the clear non-vesting nature of the benefits provisions. *Id.* Ultimately, because the retirees could point to no language—in the CBAs, the ERISA plan documents, or the plan summary—that could "reasonably be interpreted as promising vested benefits," the court dismissed their claims. *Id.* at 982.

In *Joyce*, the Second Circuit solidified the *Schonholz*/*Multifoods* framework and framed the dispositive vesting question as follows: "[W]e must determine whether the retirees have identified specific written language that is reasonably susceptible to interpretation as a promise, by [the employer], to vest the retirees' health benefits." 171 F.3d at 134. The retiree health benefits at issue in *Joyce* were provided pursuant to a series of

CBAs, each containing an ending date and specifying that medical coverage would end with the expiration of the agreement. *Id.* at 132. Although the CBAs were usually renewed, negotiation difficulties at one point resulted in a temporary termination of benefits for a few months before a new agreement was reached, and some retirees then sued under ERISA based on this denial of benefits. *Id.* The retirees argued on appeal that the district court erred in finding that the CBA language unambiguously did not vest these benefits, but the panel disagreed:

> The burden *Multifoods* imposes is ultimately one of identification: a single sentence can suffice to raise a question that requires resolution by a trier of fact. Referring to several statements that become ambiguous only after extensive linguistic contortion, however—here through fifteen pages of briefing and treatise citation—fails to satisfy this burden.
>
> We are unpersuaded by [plaintiffs'] attempt to manufacture ambiguity by statements such as "the GIAs state that insurance 'will be provided for employees receiving or becoming entitled to receive pension payments'" and "the 1965 GIA expressly provides for the 'termination' of retiree insurance upon a retiree's 'death or attaining the age at which he becomes or could become eligible for Medicare.'" These statements cannot reasonably be read as binding [the employer] to vest the benefits at issue, and *Multifoods* does not ask us to go further.

*Id.* at 134. The court went on to reject the contention that the absence of the retirees' right to convert to individual coverage if the employer benefits were terminated supported an inference of vesting, emphasizing that this "bespeaks a fundamental misunderstanding of *Multifoods*, in that the argument is simply not based on language that affirmatively operates to create the promise of vesting." *Id.* at 135. Rather, "at root the text itself must create a disputed question of fact as to vesting." *Id.* With this focus on the text of the relevant agreement, *Joyce* also instructs that the absence of a "reservation of rights" clause has no significance if a plaintiff has otherwise "fail[ed] to identify language that affirmatively

operates to imply vesting." *Id.*

    **B.**    **Analysis**

Using the language of *Joyce*, summary judgment must be denied in this case if the Plaintiffs "have identified specific written language that is reasonably susceptible to interpretation as a promise, by [FKI], to vest the retirees' health benefits." 171 F.3d at 134. Plaintiffs argue that an intent to vest can be inferred from several facts: (1) the stipend is a benefit calculated based on the employee's length of service with the company, (2) the Plan contains a beginning date but not an end date, (3) the reservation-of-rights clause contained in the pre-1992 benefits plan which was absent from the Plan at issue here, and (4) extrinsic evidence regarding discussions of vesting during labor negotiations. FKI counters that all of this is irrelevant because the terms of the Plan unambiguously show that the benefits were not vested. FKI further emphasizes that the documents show no intent to vest the benefits even if extrinsic evidence is considered.

In light of the Second Circuit's clear guidance that the vesting of welfare benefits must have some textual basis, FKI has the better argument. *Joyce* directs that courts cannot "infer a binding obligation to vest benefits absent some language that itself reasonably supports that interpretation," 171 F.3d at 135, and the Plaintiffs simply have not pointed to any such language in the CBAs. That the stipend is calculated using the retirees' years of service supports no inference of a promise to vest, because "[a] promise to pay present costs is obviously quite different than a promise to pay costs indefinitely." *Multifoods*, 116 F.3d at 982. Each CBA indicated that the stipend was effective as of 1993, but this earlier date alone is not evidence that the stipend would continue "for the remainder of [the retirees'] lives." *Devlin*, 274 F.3d at 85.

6

Plaintiffs also seek to use the testimony of union representatives present at the relevant negotiations to suggest that the issue of vesting was discussed and approved. But even if the Court were to look to extrinsic evidence, it must be taken in context. According to the deposition testimony of Richard Almeida, the union bargaining representative, "[t]he [retiree] benefit would last forever," because "[t]hat's what [they] agreed on." (Almedia Dep. 23:7–12.) Later, when asked to point to language which represented that agreement, Almeida responded: "Is there anything in [the CBA] that's a lifetime benefit? As stated such? It doesn't state that, but it's a benefit that employees earned." (*Id.* at 54:14–17.) Almeida was also asked whether there was "anything in the retiree medical provision . . . that indicates the retiree medical benefit shall continue beyond the life of the contract," to which he responded: "No. There's nothing in that language, no." (*Id.* at 27:2–5.) During his deposition, former union president James Parillo similarly could point to no contractual language supporting his belief that the retiree benefits were vested. (Parillo Dep. 45:13–46:17.) This testimony casts no doubt on the clear language used in the Plan itself.

Finally, even though the Plan does not expressly disclaim vesting, without "any affirmative language resembling the 'lifetime' language found to create an ambiguity in *Devlin*," a promise to vest cannot be inferred from the Plan terms here. *Bouboulis*, 442 F.3d at 61. Therefore, because there is no "language that affirmatively operates to imply vesting," *Joyce*, 171 F.3d at 135, the inquiry is complete: the Plaintiffs cannot cite any provision of the Plan which is reasonably capable of being interpreted as an intent to vest the medical benefits beyond the terms of the CBAs.

### III. Contractually Guaranteed Retiree Benefits

Although this conclusion disposes of Plaintiffs' central claim—that FKI breached its contractual obligations by changing a vested benefit—one related issue remains. Plaintiffs claim that FKI unlawfully changed the terms of the Plan in 2006 despite the fact that the then-current CBA would remain in effect until March 2007. Plaintiffs allege that "this was a violation of the agreement, regardless of whether the benefits were intended to survive expiration of the contract." (Pls.' Opp'n [Doc. # 44] at 14.) FKI vehemently disputes this:

> The only retirees arguably entitled to any unmodified benefit were those who retired during the term of the 2004 labor agreement, and then only for the duration of the 2004 labor agreement. Those retirees have been fully compensated for that period, with appropriate interest.

(Def.'s Reply [Doc. # 46] at 9–10.)

This claim, brought pursuant to the LMRA alone, implicates two groups of people: (1) former employees who retired before 2004, and (2) employees who retired under the CBA effective from 2004 to 2007. As to the second group, Plaintiffs admit that FKI has met any obligations it has with respect to post-2004 retirees, conceding that "Defendant has agreed to compensate [] those members of the Plaintiff class who retired during the term of the 2004–07 collective bargaining agreement." (Pl.'s Opp'n at 14.) But this is not enough, according to Plaintiffs, because the pre-2004 retirees "are entitled to reimbursement for 10 months stipend, even if the benefit is not vested." (*Id.*)

Contrary to FKI's characterization, this is not the same issue as whether the Plan provided *vested* health benefits to retirees. Rather, the question is whether the Plan, as part of the CBA effective from 2004 to 2007, provided a *contractual* guarantee of retiree benefits over the effective period of the CBA. Citing the deposition testimony of Parillo and

Almeida, FKI argues that the 2004 CBA did not grant any contractual benefits to pre-2004 retirees because the union was negotiating on behalf of employees only, not retirees. (*See* Almeida Dep. 28:15–21; Parillo Dep. 44:23–12.)  This may have been true, but regardless of whether retirees were formally represented at the negotiating table, the union and the employer were not precluded from choosing to bargain over benefits for retirees.  *See Allied Chem. & Alkali Workers of Am. Local Union No. 1 v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 171 & n.11 (1971) ("[N]othing we hold today precludes permissive bargaining over the benefits of already retired employees.").  If a jury could read the contractual language and reasonably conclude that pre-2004 retirees were in fact granted health benefits for the life of the CBA, then this more limited claim must survive for trial.

The provision in question is not a model of clarity.  Twice it mentions what *employees* may do, explaining that "Employees may purchase coverage elsewhere or purchase the Company Plan" and that "Employees will not be reimbursed for" expenditures exceeding the benefit amount.  (Pl.'s Ex. 4, Art. XI.)  At the same time, the provision is unquestionably also about *retirees*—it is captioned "Retiree Medical," and it references that each "retiree" and "dependent spouse" will receive benefits calculated according to length of service.  (*Id.*)  With this ambiguity, a fact-finder could then look to the company's past practice of offering the medical stipend to post-1993 retirees under the previous CBAs.  Taking this together, one interpretation of the contractual language—urged by FKI—is that the company was only agreeing to offer benefits to employees who retired under the 2004 CBA, and that the past practice of gratuitously offering the same benefit to preexisting retirees is not germane to the meaning of the language itself.  Another interpretation, however, is that the company was agreeing to offer the medical stipend both to employees and to former employees who

9

retired since 1993. On the current record, the Court cannot conclude that no reasonable fact-finder would find this latter interpretation to prevail.

Because there is a triable issue as to whether pre-2004 retirees are entitled to health benefits for the ten-month period after FKI modified the Plan in 2006, summary judgment must be denied on this narrow claim.

### IV.     Conclusion

Accordingly, Defendant's Motion for Summary Judgment [Doc. # 37] is granted in part and denied in part. The sole remaining matter for trial is Plaintiffs' LMRA claim that pre-2004 retirees are entitled to benefits under the Plan for the final ten months of the 2004 CBA.

IT IS SO ORDERED.

_/s/_
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 19th day of March, 2009.